# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

ALBERT SPAN,                          )
                                       )
        Petitioner,                  )
                                         )
        v.                           )              No. 07 C 2543
                                         )
UNITED STATES OF AMERICA,             )        Judge Joan H. Lefkow
                                         )
        Respondent.                  )

## OPINION AND ORDER

Following a jury trial before this court in late 2004, petitioner Albert Span was found guilty of several charges involving a conspiracy to distribute cocaine, cocaine base, and heroin within one thousand feet of a public housing facility, using a telephone in furtherance of that conspiracy, possessing heroin with intent to distribute, and witness tampering. Span was sentenced to life imprisonment on the conspiracy count, along with various shorter sentences on the other counts to run concurrently with his life sentence. On July 14, 2006, the Seventh Circuit affirmed Span's conviction. *See United States* v. *Span*, 188 F. App'x 487 (7th Cir. 2006). On May 7, 2007, Span filed a *pro se* petition in this court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, arguing that he was denied the effective assistance of counsel in violation of the Sixth Amendment. After counsel was appointed, an amended petition was filed. For the reasons stated below, Span's petition is denied. Span's related motions for production of documents and discovery [#38] and for an evidentiary hearing [#40] are denied.

## BACKGROUND

In 2000, a team of agents with the United States Department of Housing and Urban Development ("HUD") began investigating drug trafficking around Rockwell Gardens, a public

housing complex on the west side of Chicago. Span became a subject of that investigation after the authorities secured a Title III wiretap on the phone of Richard Epps, an assistant governor in the Gangster Disciples in charge of running drugs out of the 340 Building in the Rockwell Gardens public housing complex. After a falling out with his gang, Epps was barred from selling drugs at the 340 Building and sought to sell drugs across the street at the St. Stephens Terrace Apartments ("St. Stephens"). Epps recruited Span, a leader in the Black Disciples gang, to be a heroin supplier and LaShon Stuckey[1] and Donnie Allison[2] to assist him in selling drugs at St. Stephens. From November 7, 2001 to December 6, 2001, the government recorded numerous and frequent calls between Span, Stuckey, Allison, and Epps pursuant to the Title III wiretap. Epps was indicted on December 19, 2002 for a conspiracy to distribute drugs at the 340 Building to which he pled guilty in March 2003. *See United States* v. *Epps*, No. 02 CR 895. As part of his plea agreement, Epps agreed to cooperate with the government in that and other cases. Span, Stuckey, and Allison were later indicted in a separate case involving drug activity at St. Stephens. *See United States* v. *Span*, No. 03 CR 71.[3] Allison eventually pled guilty and testified for the government at Span's and Stuckey's trials. Epps was not charged in this case.

Span was initially indicted on January 30, 2003. After investigating allegations that Span had threatened Epps and Allison in attempts to prevent them from testifying at his trial, the government added charges of witness tampering against Span. In the third superseding indictment, Count I charged Span with conspiring with Allison and Stuckey to distribute mixtures containing cocaine, cocaine base, and heroin from November 2001 to December 2001 within one thousand feet of St. Stephens, part of a housing facility owned by the Chicago Housing Authority, in violation of 21 U.S.C. §§ 841(a)(1), 860(a) and 18 U.S.C. § 2. Counts III, VII, VIII, and X charged that Span used a telephone on four different occasions in furtherance of

---

[1] At his trial and sentencing, Stuckey admitted that he was a member of the Vice Lords.
[2] While testifying at Span's trial, Allison admitted that he was a Gangster Disciple.
[3] Documents from Span's criminal case will be referred to as "Cr. R. [docket number]." Documents filed in Span's § 2255 case will be referred to as "Civ. R. [docket number]."

the conspiracy, in violation of 21 U.S.C. § 843(b).  Count IX charged that Span possessed with intent to distribute mixtures containing heroin, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  Counts XI and XII charged that Span attempted to intimidate, threaten, and corruptly persuade witnesses in an official proceeding not to testify, in violation of 18 U.S.C. § 1512(b)(1).  Span was not charged in counts II, IV, V, or VI.

## I.    Pretrial Proceedings

Span was represented by a series of lawyers during the pendency of his case.  One of these lawyers, Frank Cece, Jr., withdrew in April 2004 in response to a perceived conflict of interest stemming from his having spoken to Stuckey about representing him in February 2003 before entering an appearance on Span's behalf.  In May 2004, Anthony Carullo entered his appearance as Span's counsel and represented him at trial.

In June 2003, an order was entered requiring Span to be separated from Epps, Allison, Stuckey, and a list of other named individuals in federal custody.  Span was therefore moved from the Metropolitan Correctional Center ("the MCC"), where Epps, Allison, and Stuckey were housed, to the DuPage Correctional Facility ("DuPage").  Special Administrative Measures ("the SAMs") were put in place regulating Span's detention.  The SAMs were not intended, however, to restrict Span's access to his lawyer and instead provided that, among other things, Span had the right to privileged communications with counsel.  Despite these protections, Carullo complained about Span's conditions of confinement to the court in July 2004, arguing that the limitations on his visits with Span were hindering trial preparation, and asked that Span be transferred back to the MCC.  The court denied the request for a transfer but agreed to issue an order to facilitate Carullo's visits with Span.  In September 2004, Carullo again requested that Span be transferred to the MCC to facilitate preparation for Span's trial as the trial date neared. The court entered an order to this end.  It also ordered that, while Span remained at DuPage, Carullo be allowed direct contact with Span, that their visits not be interrupted as long as they

did not interfere with DuPage's normal operations, and that Span be provided audio and visual equipment to review the government's evidence.

In September 2004, Span and Stuckey each filed a motion to sever, claiming mutually antagonistic defenses and, in Span's case, that he believed a codefendant, presumably Stuckey, would have exculpatory testimony if called to testify. The court granted Stuckey's motion and Stuckey proceeded to trial first.

At Stuckey's trial, the government argued that Stuckey sold crack cocaine and heroin at St. Stephens as part of the conspiracy. Stuckey testified in his own defense, admitting that he sold drugs at St. Stephens but denying that he ever received drugs from Epps or Span for resale. Stuckey maintained that there was no one individual or group that controlled drug sales at St. Stephens, testifying that it was every man for himself, and that while Epps offered to supply him with cocaine, Epps never actually did. Stuckey also testified that he knew Span because Span was a coordinator at a local gym and denied having any interactions with Span related to drugs. Although the government had a recording of a telephone call between Span and Stuckey, Stuckey explained that he was not asking Span about drugs but rather about whether Span was opening the gym at which Span worked.

The government confronted Stuckey with his July 2003 proffer, in which he admitted that Span provided heroin to Epps, Allison, and others selling drugs at St. Stephens, that he and Epps had picked up 25 grams of heroin from one of Span's workers, and that Span would come by St. Stephens to pick up money from Allison. Stuckey also told the government in his proffer that he feared cooperating against Span and that Span asked Stuckey to sign an affidavit saying Span was not involved in the charged conspiracy, similar to ones he had been told Epps and Allison had already signed. He also stated that Span had arranged for Cece, his prior counsel, to meet with Stuckey about representing him and that when Stuckey asked about what such representation would cost, Cece responded that Span's nephew and another individual would pay the legal fees. Cece also allegedly asked Stuckey whether he had talked to the government about

the case.  In both his direct testimony and on cross-examination, Stuckey claimed that everything in his proffer was a lie, done at Allison's urging as an attempt to receive a sentence reduction. He maintained that the only times he communicated with Span while in prison were when the two were brought to court and, that on these occasions, he never heard Span threaten Allison or his parents.  The jury found Stuckey guilty on one count of using a telephone to commit or facilitate the committing of a drug conspiracy.  He was found not guilty on the remaining counts, including the drug conspiracy.

Carullo attended portions of Stuckey's trial to prepare for Span's case.  In his affidavit, Carullo represents he attended portions of Epps's testimony.  He also states that he received copies of the tape transcripts used at Stuckey's trial and an excerpt of Allison's testimony. Shortly before Span's trial began, Carullo met with Span at DuPage where they reviewed some of the transcripts together.  While Carullo was allowed to be in the same room as Span for this visit, Span claims his review of the transcripts was hampered by the fact that one hand remained handcuffed to a table and the short duration of the visit.  He also states that he did not have the opportunity to hear the recordings before trial.

## II.    Span's Trial

Span's trial began on October 20, 2004.  The government began its opening statement with the message Span allegedly passed on to Epps and Allison in early 2003: "My mother and father are dead.  Somebody else's mother and father are going to be dead, too."  Trial Tr. 9:15–16, Oct. 25, 2004.  The government then proceeded to lay out the evidence it planned to present to the jury, including Epps's and Allison's anticipated testimony and the wiretap recordings, what it termed the "best evidence of Span's involvement in [the] conspiracy and the drug-dealing." *Id.* at 18:6–7.  Following the government's presentation, Carullo acknowledged that "there is overwhelming evidence of a conspiracy to deal drugs, an overwhelming conspiracy between Epps and Allison, who were drug dealers." *Id.* at 29:1–3.  He maintained, however, that

Span was not involved and that the recorded conversations between Epps and Span were instead about matters aside from drugs.

### A. Epps's Testimony

#### 1. Direct Examination

Epps testified as a government witness. He admitted to having pled guilty to a drug conspiracy offense in a separate case in return for a twenty-three year sentence. While that case solely related to drug dealing at Rockwell Gardens, Epps testified that he pled guilty to drug dealing at Rockwell Gardens *and* St. Stephens. Epps testified in some detail about drug dealing at the 340 Building. After a falling out with the Gangster Disciples who controlled the 340 Building and being approached by Allison about supplying him with drugs in fall 2001, Epps testified that he decided to open an operation to sell crack cocaine and heroin at St. Stephens, where members of several different gangs had been selling drugs.[4] Epps introduced Allison to Span, whom Epps had known for approximately twenty years, intending for Span to provide Allison and others, including Stuckey, with heroin to sell at St. Stephens. Epps testified that Span agreed and proceeded to provide heroin to Allison at $100 per gram. Several tapes of conversations involving Span were played, which Epps identified as discussions about Span supplying Allison and Stuckey with heroin. Epps also spoke to both Allison and Span about increasing the amount of heroin Span provided to Allison. Other conversations involved Span exchanging heroin and money from drug sales with Allison and Stuckey directly and through a runner and the amount of money Span expected to receive from heroin sales. Some conversations also revolved around guns, a contemplated fraudulent credit card scheme, and obtaining illegally purchased cell phones. In one call, Epps related how he had given Span a cell phone purportedly for money he was owed from heroin sales that Allison had shorted him on. In

---

[4] Toward the end of the operation's existence, however, tapes showed that Epps considered St. Stephens to be his operation's territory and that Epps did not look kindly upon other individuals selling drugs there.

subsequent calls, he instructed Span to stop providing heroin to Allison and others due to Allison's actions but then told Span to resume distribution the following day.

Epps also testified to the distribution of crack cocaine at St. Stephens and how, on one occasion, Epps had bought a kilogram of cocaine to cook into crack cocaine that was of poor quality and had to be returned. Tapes were played in which Epps discussed this issue with both Stuckey and Span. Epps himself visited St. Stephens to monitor the operation because, as he put it, his and Span's reputations were on the line. A recording was played in which Epps told Stuckey that they had to sell drugs at a faster pace to show Span that they wanted to continue receiving heroin from him. Epps testified that the operation at St. Stephens began to run into trouble in December 2001 because Allison was not properly monitoring the drug sales and there was an increased police presence in the area. In another call, Epps told Allison that Span understood that part of the reason drugs were not moving as fast at this time was because the police were watching the area.

Epps testified as to the witness intimidation charge as well. He said that he spoke with Allison through the vents at the MCC. During one of these conversations, Allison told him that Span had asked Allison how Epps would feel if he did not have a mother or a father for getting them into their present predicament. Epps interpreted this as a threat to his family, told his mother, and asked his mother to call the U.S. Attorney's Office with the information.[5] Epps also related that while in segregation together, Span asked Epps to recant his previous statements regarding the case, sending him notes to the same effect. Epps testified that, in response, he signed affidavits that he had prepared with Span's input recanting his prior testimony as it related to Span only.[6] Epps stated that these affidavits contained lies. While he knew that the

---

[5] Epps testified that he never heard back from his mother as to whether or not she contacted the U.S. Attorney's Office about the threats. On cross-examination, Carullo questioned Epps extensively on this, attempting to establish that Epps was angry at the government for not taking any action.

[6] Versions of the affidavit that eventually was submitted to the court were entered into evidence. Handwriting exemplars from Span and Epps were also submitted for purposes of comparison.

affidavits would put in jeopardy his plea agreement with the government, Epps stated that he did this because he would rather face longer jail time than have his family harmed. Epps also related that he kept notes of his interactions with Span while he was in jail. The notes and affidavits were entered into evidence.

### 2. Cross-Examination

Under extensive cross-examination, Epps testified that, at the time he recanted his prior testimony, he felt as if the government had not been living up to its end of his plea agreement. He also admitted to thinking that, at the time he entered the plea agreement, there was a chance that testifying against Span and others would put his family in harm's way. Carullo elicited that Epps had provided information to the government against over twenty-five people. He emphasized the fact that, if Epps stood by his recantations, he would lose his agreed upon term of twenty-five years and instead face a sentence of life in prison. With respect to the notes Epps claimed he kept contemporaneously with the threats he received from Span, Carullo challenged the order in which they were written, as events were not listed in chronological order, raising an inference that the notes were actually fabricated. Carullo also asked Epps why he did not initially report the threats to MCC personnel or the U.S. Attorney's Office. After Epps testified that Span was like a brother to him, Carullo inquired of Epps whether he had heard that Span was having an affair with Epps's wife in an attempt to establish a motive for Epps testifying against Span.

Carullo emphasized that Epps was constantly coming up with schemes and scams for his own benefit. He got Epps to admit that he lied in some of the taped conversations where it was to his advantage. Epps also admitted to his conversations with Span being about more than just drugs. Carullo then questioned whether Epps was being truthful in having identified some conversations as dealing with drugs when they could have been about guns, cell phones, or the credit card scheme. He elicited that Epps usually referred to individuals by their street names when discussing drugs but referred to Span by his first name. In Epps's conversations with other

individuals which he testified were about Span's involvement in the drug conspiracy, Span's name was never explicitly mentioned. Carullo also challenged Epps's ability to remember the details of the taped conversations.

### 3. Redirect Examination

Prior to Span's trial, the government sought to introduce evidence under Rule 404(b) related to an incident in which Span allegedly threatened to kill Cornelius Jackson ("Li'l Ride") so that he would retract statements damaging to Span and other Black Disciple members. The court denied the motion. Cr. R. 160. After Epps's cross-examination, the government asked the court to reconsider its ruling on the Li'l Ride evidence, representing that it wished to use it to rehabilitate Epps's credibility so as to show that Epps had a reason to take Span's threats seriously and to not report them immediately. The court allowed this line of questioning for credibility purposes only and gave a limiting instruction to that effect. Epps testified that in June 2001, Span had come to the 340 Building wanting to kill Li'l Ride. In August 2001, Epps testified that Span told him of a failed attempt on Li'l Ride's life. After Li'l Ride had identified those involved in that shooting, Epps reported that Span told him that he had convinced Li'l Ride to retract that identification in November 2001, as captured by the wiretap on Epps's phone. Epps testified that this incident caused him to worry particularly about his safety when Span made the threat to Epps's family. Epps also testified that the government had taken steps to ensure his and his family's safety after he reported Span's threats. He stated that his wife had been put into a witness protection program for a period of time.

### B. Donnie Allison's Testimony

### 1. Direct Examination

Allison testified that shortly after being released from prison in October 2001, he was introduced to Span by Epps and began selling drugs with him. Allison admitted to having been charged in the same conspiracy as Span. He pled guilty under a cooperation agreement and stated that he was expecting to receive a ten-year sentence, below the forty-year maximum

sentence he potentially faced. He also admitted to having been convicted of various other crimes.

Allison had grown up at St. Stephens. After being released from prison in October 2001, he met with Epps to discuss selling heroin supplied by Span. He first began by passing out the drugs for free to attract customers. Allison testified that once the operation became established at St. Stephens, no one else could sell heroin without going through him. Allison would receive between five and ten grams of heroin from Span about once or twice a week. To obtain the heroin, Allison testified that he would generally call Epps, although he sometimes called Span directly. The drugs were usually dropped off at or across the street from St. Stephens or Allison would pick them up at Victor Herbert Park, several blocks from St. Stephens. Allison testified that he would pay Span directly. He further testified that one recorded conversation concerned heroin he returned to Span as it was not of good quality. Another recording involved a conversation where Epps told Allison that Span, Stuckey, and Epps had been looking for Allison to which Allison responded that he had sold five grams of heroin provided to him by Span in one night.

Allison also testified about the threats Span had made. He related that, while in the lockup at the courthouse, Span told him "[t]hat [Span's] mother, father dead. Somebody else['s] mother, father going to be dead." Trial Tr. 451:22–23, Oct. 28, 2004. Allison testified that he understood this as a threat to anyone cooperating against him and their families, including Allison and Epps among others. He related this information to Epps through a vent at the MCC. As Epps did, Allison also was asked by Span to provide an affidavit saying that Span was not involved in any drug conspiracy. When Allison refused, Span became angry.

### 2. Cross-Examination

On cross-examination, Allison admitted that he had never directly told Span that he was cooperating with the government at the time Span made his threats. He also stated that the first time he met Span, Span did not say anything and the only thing Epps said in introducing Span

was that Span was his guy, which Carullo pointed out could mean not only a supplier of heroin but also a friend. Allison admitted that he never received drugs directly from Span but always from someone delivering them on his behalf and that, although he testified on direct that he always gave money to Span directly, on occasion he would give it to somebody else.

### C.    Princeton Davis's Testimony

Davis testified to the witness intimidation charges against Span. He met Span while both were in Boone County Jail ("Boone") in May and June 2003. Davis admitted to being in federal custody for bank robbery and that he was cooperating with the government as to the bank robbery in exchange for a reduced sentence. At the time he testified, he had nineteen months of his sentence left to serve.

Prior to his incarceration, Davis sold drugs on the west side of Chicago. While in Boone with Span, Davis and Span spoke every day. During these conversations, Davis testified that Span told him that he was charged with a drug conspiracy along with Epps and Allison. One day on their way to federal court, Span told Davis about selling heroin at St. Stephens and even pointed out the location as they passed by. Davis also testified that Span had told him that he tried to get both Epps and Allison to sign affidavits saying that he was not involved in the conspiracy. Span also commented that the government would not have a case against him without Epps's cooperation. Span said he would have Epps, Allison, and their families "taken care of" if they testified against him, which Davis understood to mean killed. He related that although Span asked him to pass some messages on to others at the MCC when Davis was transferred there, Davis did not do so. Davis also testified that, when he was transferred back to the MCC in September 2004, Ms. Nash, a counselor at the MCC, asked him whether he was back to testify in Span's trial.

On cross-examination, Davis admitted that he did not contact the government directly about what Span had told him but instead waited several months after Span and Davis were in Boone together to contact the government through an intermediary. Davis conceded that Span

11

never told him whether Epps or his wife, Angel, were dealing drugs. When Carullo showed him a picture of the St. Stephens area, Davis could neither identify from which buildings Span had said he was dealing drugs out of, nor could he show the jury which road they were driving on when Span pointed out St. Stephens to him on the way to the federal courthouse. Finally, Davis testified that Nash was always telling other inmates about who was cooperating with the government but that he was not afraid of her. He did, however, mention that Nash spreading word about who was cooperating with the government did have the potential of endangering cooperators.

On redirect, Davis testified that he had never contacted the government about what Span told him at Boone because he was afraid of Span. He stated that Span "could touch—he [could] reach out and touch somebody." Trial Tr. 524:24–25, Oct. 28, 2004. On recross, Carullo asked Davis to state the names of anyone that Span told him he had killed, to which Davis responded that he did not know names or whether the people Span had mentioned had been killed or not. The government asked for a sidebar and argued that it should be allowed to rehabilitate Davis's credibility after that line of questioning with evidence related to the Li'l Ride incident. The court allowed the evidence in. Davis then testified about a specific incident at Boone when Span called his nephew, after which Span told Davis that his nephew was shooting Li'l Ride and that Span had encouraged him to continue pursuing Li'l Ride. Carullo followed up by asking whether Davis knew if Li'l Ride had been killed, and Davis stated that he did not know.

### D. Lester Green's Testimony

Green testified that he was a Gangster Disciple (although he had previously been a Black Disciple), had known Span for many years, and had been held at the MCC on the same floor as Span for a few months in 2003. He revealed that he had pled guilty to various gun charges in May 2003 but that he would not get additional time off for his testimony in Span's case. Green testified that Span told him that Epps was cooperating with the government and that without Epps, Span would not be in prison. Green then testified that Span essentially asked him to kill

12

Epps's mom in exchange for Span helping Green get bond to carry out the job and additional payment. To get money for bond, Green testified that Span directed him to his sister and girlfriend. Green had a receipt on the back of which, allegedly in Span's handwriting, was the name and address of Lillie Bell, Span's sister, to whom Green stated he wrote letters in order to inform Span that he was still trying to get the promised money for bond. In addition, the receipt had the name and phone number for Michele, supposedly Span's girlfriend, but Green testified that he never called that number. In fact, Green testified that he never received bond nor did he ever attempt to kill Epps's mother. He stated that he only had this one conversation with Span about the issue.

On cross-examination, Carullo questioned Green's ability to remember details about the events he testified to on direct. Green admitted that he had been denied bond and that he was testifying pursuant to a plea agreement. He also testified that he was not afraid of Nash and knew of no reason to be afraid of her. On redirect, Green admitted that Nash would joke about people cooperating with the government.

### E. Defense Case

At the close of the government's case, Span's counsel conferred with Span as to whether he wanted to testify at trial. The trial was set over for several days as counsel continued to confer with Span, who ultimately chose not to testify. The defense then rested without putting on any witnesses.

### F. Closing Arguments

The government summarized the evidence at trial and asked the jury to find Span guilty on all counts. In reviewing the elements of a drug conspiracy, the government referenced Span's opening argument, in which Carullo stated "that there is overwhelming evidence that a conspiracy existed." Trial Tr. 612:25–613:1, Nov. 3, 2004. The government discussed the Li'l Ride evidence as bolstering Epps's credibility as to the witness intimidation charges.

In his closing statement, Carullo stated that he was not arguing that the government did not meet its burden of proving that Mr. Span was a drug dealer but rather that "Mr. Span is innocent of dealing drugs with Richard Epps and Donnie Allison." *Id.* at 646:3–5. He admitted that what was captured on the recordings reflected that Span was doing something illegal but emphasized that this illegality related to credit cards and cell phones, not drugs. Carullo went into detail as to some of the recorded calls, explaining how they could be interpreted to relate to a credit card scam and not drug deals. He attempted to undercut Epps's credibility, claiming that Epps was a street hustler looking for the best deal related to his criminal charges. Similarly, Carullo argued that the other witnesses who testified pursuant to a plea agreement were also lying in order to curry favor with the government in an attempt to get more lenient sentences. Carullo concluded his closing argument by stating that "[a]ll Albert Span did was deal with some credit cards with Richard Epps. And for that reason, Albert Span is not guilty of all the charges that the government is bringing against him." *Id.* at 662:5–8.

In rebuttal, the government emphasized that Span's argument that he only dealt in credit cards "flies in the face of all of the evidence . . . in this case and it doesn't make any sense at all." *Id.* at 662:15–16. The government also attempted to rebut Carullo's implication that the government's witnesses were making up stories in order to get better sentences. It argued that the testimony was supported by the recordings and that the witnesses were all still going to serve prison sentences despite their testimony against Span.

### G.    Verdict

The jury found Span guilty on all counts in which he was charged. For sentencing purposes, the jury found that Span was a leader or organizer of the conspiracy and that it involved 50 grams or more of cocaine base, 500 grams or more of cocaine, and 80 grams or more of heroin. Span was also found to have possessed with intent to distribute more than 10 grams but less than 20 grams of heroin. The jury further concluded that Span had committed the offenses while under a criminal justice sentence and within two years of his release.

### III.    Posttrial Motions and Sentencing

Span requested judgment of acquittal, or in the alternative a new trial, arguing among other things that there was insufficient evidence to sustain his conviction, that the trial court erred in admitting the Li'l Ride evidence, and that he received ineffective assistance of counsel because his pretrial conditions of confinement substantially prejudiced his ability to prepare for trial and  certain witnesses were not called on his behalf.[7]  Span also wrote the court in support of his motion for a new trial, claiming that Carullo was not prepared for the trial.  He complained of the restrictions placed on him while at DuPage, that he did not hear the tapes until trial, that Carullo did not go over all of the government's evidence with him before trial, that Carullo did not call any witnesses, specifically Earl William, Angel Epps, and Lashon Stuckey,[8] on Span's behalf or put on a defense, and that Carullo should have advised Span to plead guilty if he believed that the evidence against Span was too strong.  Span also requested a new attorney.  Pursuant to that request, Carullo was replaced by Robert Gevirtz.  The court denied Span's motions for acquittal and new trial.

Span's sentencing took place on June 29, 2005.  He faced a mandatory minimum of 20 years and a maximum of life imprisonment.  The court sentenced Span to concurrent sentences of life imprisonment on count I, ninety-six months' imprisonment on counts III, VII, VIII, and X, 360 months' imprisonment on count IX, and ten years' imprisonment on counts XI and XII.

### V.    Appeal

Span timely filed a notice of appeal on July 7, 2005.  New counsel was appointed for the appeal.  After reviewing the record, counsel moved under *Anders* v. *California*, 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967), to withdraw because he could not discern a nonfrivolous issue for appeal.  *Span*, 188 F. App'x at 489.  The Seventh Circuit agreed and

---

[7] In his posttrial motions, Span named Ms. Nash, Mr. Savage, and Mr. Lee, MCC prison officials, as the witnesses who should have been called.

[8] Span stated that Stuckey's attorney spoke to Carullo during Span's trial indicating that Stuckey wished to testify.  Carullo allegedly responded that he did not think that was a good idea.

dismissed the appeal on July 14, 2006. It found that, given the strength of the evidence against Span, any potential challenge to the sufficiency of the evidence on any count or sentencing factor would be frivolous. *Id.* at 489–90. The Seventh Circuit also concluded that it was not an abuse of discretion for the trial court to admit the Li'l Ride evidence "to rehabilitate Epps and lend plausibility to his story." *Id.* at 491. The court also ruled that any claim for ineffective assistance of counsel would more appropriately be brought in a § 2255 proceeding. *Id.* at 492. The Supreme Court denied Span's petition for a writ of certiorari on November 13, 2006. *Span* v. *United States*, 549 U.S. 1044, 127 S. Ct. 611, 166 L. Ed. 2d 453 (2006).

## VI.     § 2255 Petition

Span filed a *pro se* § 2255 petition on May 7, 2007. The court appointed counsel to represent Span and granted him leave to amend his petition. Before counsel had submitted an amended petition, however, Span filed a *pro se* motion to amend his petition on July 2, 2007, with a memorandum in support. On December 6, 2007, counsel filed an amended motion incorporating portions of Span's previous *pro se* filings and affidavits from Span, Carullo, Stuckey, Stuckey's trial counsel, and Span's sister, Lillie Bell. The court will consider those claims raised in Span's amended motion (Civ. R. 22), including those from Span's *pro se* filings as incorporated therein.[9]

## DISCUSSION

Relief under § 2255 "is reserved for extraordinary circumstances." *United States* v. *Hays*, 397 F.3d 564, 566 (7th Cir. 2005) (citations omitted) (internal quotation marks omitted). A district court must grant a § 2255 motion when the petitioner establishes "that the district court sentenced him in violation of the Constitution or laws of the United States or that the sentence

---

[9] After Span's amended motion was filed and fully briefed, Span filed a *pro se* motion to amend his petition (Civ. R. 39). This motion was never properly noticed or responded to by the government. In it, Span raises additional claims of ineffective assistance of counsel for (1) failure to object to a sentencing enhancement and (2) failure to use impeachment material to cross-examine Allison and Epps. These claims will not be considered as they are not properly before the court.

was in excess of the maximum authorized by law or is otherwise subject to collateral attack." *Id.* at 566–67 (citations omitted) (internal quotation marks omitted). It is proper to deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively demonstrate that the prisoner is entitled to no relief." 28 U.S.C. § 2255.

In order to establish constitutionally ineffective assistance of counsel, the petitioner must show (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) "that there exists a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different." *Strickland* v. *Washington*, 466 U.S. 668, 697, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To satisfy the performance prong of the *Strickland* test, the petitioner must direct the court to specific acts or omissions of his counsel. *Fountain* v. *United States*, 211 F.3d 429, 434 (7th Cir. 2000) (citing *United States* v. *Trevino*, 60 F.3d 333, 338 (7th Cir. 1995)). The court must then consider whether, in light of all the circumstances, counsel's performance was outside the range of professionally competent assistance. *Id.* The court strongly presumes that counsel's performance was effective, *Trevino*, 60 F.3d at 338, and must not let hindsight interfere with its review of counsel's decisions. *Harris* v. *Reed*, 894 F.2d 871, 877 (7th Cir. 1990) (citing *Strickland*, 466 U.S. at 697). Under the prejudice prong, to establish the reasonable probability that the outcome would have been different, the petitioner must show "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. A court need not address both prongs of the *Strickland* test if one provides the answer; that is, if a court determines that the alleged deficiency did not prejudice the defendant, the court need not consider the first prong. *United States* v. *Fudge*, 325 F.3d 910, 924 (7th Cir. 2003).

## I.    Failure to Consult with Span and Adequately Prepare for Trial (Ground I of Amended Petition)[10]

In his first claim for relief, Span alleges that Carullo did not adequately prepare for trial, in that he did not properly investigate the facts surrounding the wiretap recordings or consult with Span regarding the same.  Span claims that Carullo did not acquire the transcripts of the recordings until the eve of trial, based on Stuckey's lawyer's affidavit that Carullo requested the transcripts from him in October 2004.[11]  He also states that Carullo did not thoroughly review the transcripts with Span pretrial and, to the extent he did, reviewed them too late to effectively prepare for trial.[12]  Span contends that Carullo was also ineffective for failing to provide copies of the recordings and the transcripts to Span for his review between visits.  Finally, Span argues that Carullo was not adequately prepared for trial in that he did not know the full extent of the facts pertaining to the Li'l Ride incident and so could not properly advise Span about his right to testify.

---

[10] To the extent Span includes challenges to Carullo's failure to investigate potential witnesses in this ground for relief, those challenges will be discussed in Section III.

[11] Carullo's affidavit also states that the government furnished him with transcripts of the recordings played during Stuckey's trial in early October 2004.

[12] Span complains that the fact that he was shackled during Carullo's visit in which they reviewed transcripts impeded his ability to review the transcripts.  To the extent that this can be construed as a claim that his housing at DuPage and the restrictions placed on him there amount to a constructive denial of the effective assistance of counsel, the argument fails.  The distance from the federal courthouse in the Northern District of Illinois to DuPage, while inconvenient for counsel, was not so great that it would be unreasonable for counsel to endure the drive to meet with Span, and there is no dispute that counsel did indeed meet with Span at DuPage.  *See United States* v. *Lucas*, 873 F.2d 1279, 1280 (9th Cir. 1989) (defendant's pretrial detention in a facility 120 miles from counsel did not amount to actual or constructive denial of the assistance of counsel).  Further, the SAMs to which Span was subject did not impede the assistance of counsel even though Span remained shackled during such visits.  Even if Span could show that the burden on counsel because of where he was housed was unreasonable, he has failed to specifically allege how the distance and restrictions impaired the quality of representation.  The fact that Span only had one hand free to review transcripts does not rise to the level required for constructive denial of effective assistance of counsel.

To the extent Span's argument goes to his counsel's failure to raise concerns about these restrictions to the court, the argument also fails.  In response to counsel's concerns about his ability to meet with his client, the court issued orders to facilitate meeting with Span.  Although counsel's requests with regard to Span's housing at DuPage instead of the MCC and other restrictions related to Span's detention were not always met with success, this was not due to a failing of counsel but rather to restrictions outside of the court's control.

## A. Wiretap Recordings

Even assuming that Span could establish that his counsel's pretrial preparation with respect to the wiretap recordings was unreasonable, Span cannot demonstrate that he was prejudiced. The evidence against Span was overwhelming and Carullo did his best to challenge what he could. Span argues that Carullo's inadequate knowledge of the contents of the wiretap recordings impeded his ability to challenge various portions of the testimony at trial, including the case agent's and Epps's statements that the transcripts accurately reflected the recordings, and led Carullo to elicit damaging testimony from Epps and Allison. Nothing in the record or Span's motions indicates how Carullo could have successfully challenged the case agent's and Epps's testimony that the transcripts were accurate. Further, any prejudice that resulted from these statements was cured by the limiting instruction that the recordings themselves, not the transcripts, were the evidence and that if there were discrepancies, the jury was to rely on what it heard, not what it read. *See* Cr. R. 186 at 18.

Span's amended motion asserts that Carullo's lack of preparation "hampered his ability to cross-examine Epps and Allison and, in fact, by tending to reinforce their direct testimony, was actually harmful." Am. Mot. ¶ 76. Span, however, does not explain how more time or preparation would have made a difference to the outcome of the trial. He also cannot show that reviewing the recordings, and not just the transcripts, with Carullo would have made a difference to the outcome of the proceedings. On the contrary, a review of Carullo's cross-examination of Epps and Allison reveals his detailed knowledge of the contents of the tapes. For example, in Carullo's questioning of Epps about whether anyone had received heroin from Span on a particular day, as the government had portrayed in piecing together several phone conversations, Epps conceded that the recordings did not establish, and he did not know, that Span had delivered heroin to anyone in that instance. *See* Trial Tr. 316:23–317:7, Oct. 27, 2004. Carullo also was able to emphasize during Epps's cross-examination that, when Epps claimed that Span was delivering drugs or receiving money for the drugs, Span was never referred to in the

recordings by name, but when discussing other things, like credit cards, guns, or cell phones, Epps referred to Span by name. Carullo highlighted this talk of credit card scams in various recorded conversations, consistent with his defense that Span did not participate in dealing drugs with Epps but instead was involved in other schemes with him. Carullo also got Epps to admit that Span was having an affair with his wife, which brought to light one motivation for Epps to testify against Span even though he claimed to think of him as a brother. Span faults Carullo for allowing Epps to identify Span's voice in call 19 but does not explain how this could have been avoided or what prejudice resulted. Carullo also elicited from Allison that he never received drugs directly from Span in an attempt to cast doubt on whether Span was actually involved. Although some of Carullo's questioning of Epps and Allison may not have produced the answers Span desired, Carullo could not control what these adverse witnesses would say.[13] Span also argues that counsel erroneously opened the door to the admission of the Li'l Ride evidence by questioning whether Epps took the alleged threat to his parents seriously.[14] Even if counsel opened the door to admission of the Li'l Ride evidence, he also discredited Epps by showing that Epps had not reported the threat to officials at the MCC. As the evidence against Span was

---

[13] Span specifically points to Carullo's questioning of Allison about whether he had received heroin from an individual named Mel. Although Allison later stated that "Mello" was a nickname for Span, he also indicated that Span, when referred to as Mello in the particular call, was not the same person as the Mel from whom he had received heroin. On redirect, Allison also admitted that Mello was just a common nickname for various individuals, undercutting any claim of prejudice Span might have for Carullo asking Allison about who Mel was. Span's claim that he was prejudiced by Carullo's lack of preparation because Carullo allowed Epps to testify about how certain calls involved heroin on cross-examination also does not have merit. While Epps did testify as to how the calls concerned heroin sales, Carullo's questioning on the subject chipped away at Epps's direct testimony and cannot be said to have undermined confidence in the outcome of the proceeding. Similarly, even though Carullo asked Epps to identify initials on a document Epps claimed he kept to record Span's threats contemporaneously with the events, bringing out that "AS" stood for Albert Span, this information had already been elicited in the government's direct examination. Furthermore, Carullo questioned the truthfulness of Epps's claim that this was a contemporaneous document, as events were listed out of order on the document. Such questioning could only be said to have helped Span.

[14] In another portion of his motion, however, Span claims that Carullo was ineffective for not asking Allison whether he took Span's threat seriously. Span cannot have it both ways, arguing in one instance that asking such a question was ineffective and in another that not asking the question was ineffective.

overwhelming, and Carullo effectively cross-examined the government's witnesses in the face of this overwhelming evidence, the court concludes that Span was not prejudiced by any potential failings by Carullo to adequately review the wiretap recordings.

**B.      Advice Regarding Span's Right to Testify**

Span's argument that Carullo was also ineffective because he was not fully aware of the facts underlying the Li'l Ride evidence and so could not advise Span properly about his right to testify also fails.  Carullo generally knew about the Li'l Ride evidence, as the government had provided details of the underlying facts in its motion to admit the Li'l Ride evidence filed in September 2004.  *See* Cr. R. 148.  While Carullo may not have been as aware of the facts regarding the Li'l Ride evidence as Span's attorney in that separate case, the Li'l Ride evidence was not central to the issues before the court.  Span does not elaborate on how more extensive knowledge would have affected his decision, or counsel's recommendation, not to testify. Carullo had reason to be wary of placing Span on the stand, and the record reflects that he spent some time discussing the decision with Span at the close of the government's case, as Span admits in his amended motion.  Span ultimately informed the court twice that he did not wish to testify and affirmed that he made this decision after having consulted with and been advised by counsel several times.  Nothing prevented Span from going against his attorney's advice to remain silent, and nothing suggests that the advice given by counsel was deficient.  *See United States* v. *Curtis*, 742 F.2d 1070, 1076 (7th Cir. 1984) ("Certain constitutional rights are so fundamental that they are deemed personal to a defendant, and he alone may decide whether these rights will be exercised or waived.").  In light of the record, establishing that counsel advised Span of the negative consequences of testifying and was generally aware of the Li'l Ride evidence, Span has failed to show that he was deprived of meaningful advice as to his right to testify.  *See United States* v. *Goines*, 988 F.2d 750, 780 (7th Cir. 1993) (counsel's recommendation that his client not take the stand was appropriate where counsel had listened to

the wiretap recordings of his client and had previously seen the blistering cross-examination of a co-conspirator).

## II.    Failure to Present an Adequate Defense (Ground II of Amended Petition)[15]

Span argues that Carullo should have advanced a buyer-seller defense and asked for such a jury instruction rather than arguing that Span was simply not involved in the conspiracy. This, however, invites the court to second-guess counsel's strategic decisions in hindsight; playing "Monday morning quarterback" is not the court's role. *United States* v. *Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009). Carullo made a tactical decision, based on the evidence the government indicated it would present and the various nonfrivolous defenses available, to argue that Span was not involved in a drug conspiracy with Epps, Allison, and Stuckey.[16] Counsel is not required to raise every nonfrivolous defense available. *Knowles* v. *Mirzayance*, --- U.S. ----, 129 S. Ct. 1411, 1422, 173 L. Ed. 2d 251 (2009). While Span may now characterize counsel's chosen theory as being weak, Carullo did succeed in extracting admissions from Epps and Allison that ostensibly supported this theory. Unfortunately for Span, these bits of favorable evidence were overshadowed by the overwhelming evidence of Span's involvement with drugs. Thus, while in hindsight it might appear to have been better to concede guilt on count IX (possession with intent to distribute heroin) and argue that Span only had a buyer-seller relationship with the others involved in the conspiracy, instead of going for broke on all drug counts, this does not allow for the conclusion that Carullo's decision not to pursue such a theory falls below the objective standard of reasonableness required to establish ineffective assistance.

---

[15] Span's amended motion refers to this as a failure to conduct reasonable investigation, but the substance addresses his claim that Carullo did not present an appropriate defense.

[16] Span contends that Carullo conceded in opening statements that there was overwhelming evidence that a drug conspiracy existed and, in closing statements, that Span was a drug dealer. In closing, Carullo stated that Span was not arguing that the government did not meet its burden of proof on the conspiracy charge (i.e. that it had only proven its case by a preponderance of the evidence instead of beyond a reasonable doubt). This, and his statement in opening that the evidence shows that *a* drug conspiracy existed, bolstered the defense theory that "Span is innocent of dealing drugs *with* Richard Epps and Donnie Allison." Trial Tr. 646:4–5, Nov. 3, 2004 (emphasis added).

Similarly, Span's argument that Carullo should have requested a multiple conspiracy instruction fails, as there is no evidence in the record that such an instruction was necessary or would have been deemed appropriate. *See United States* v. *Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005). Although there was some mention early in the trial about Epps's involvement in a different conspiracy at Rockwell Gardens, the court gave a limiting instruction that the jury could only consider the Rockwell Gardens conspiracy for the sole purpose of determining Epps's credibility. Since the jury is presumed to have followed the limiting instruction, *Soltys* v. *Costello*, 520 F.3d 737, 744 (7th Cir. 2008), the court does not find that Carullo's failure to request a multiple conspiracy jury instruction was unreasonable.

## III. Failure to Investigate and Call Witnesses (Ground III of Amended Motion)

Span argues that his counsel failed to thoroughly investigate his case and to call certain witnesses, specifically Stuckey, his sister, Lillie Bell, and three MCC personnel, Nash, Savage, and Lee. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. While diligence is required in investigating a client's case, counsel need not "track down every lead or . . . personally investigate every evidentiary possibility before choosing a defense and developing it." *Sullivan* v. *Fairman*, 819 F.2d 1382, 1392 (7th Cir. 1987). Such tactics would not necessarily improve a case, and "a lawyer's decision to call or not call a witness is a strategic decision generally not subject to review." *United States* v. *Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997); *accord Valenzuela* v. *United States*, 261 F.3d 694 (7th Cir. 2001). "The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record." *United States* v. *Balzano*, 916 F.2d 1273, 1294 (7th Cir. 1990). Even strategic decisions made after less than complete scrutiny are generally considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691.

### A. Lashon Stuckey

Even if it is assumed that Carullo did not adequately investigate what Stuckey's testimony would be and should have called him to testify, Span cannot establish that he was prejudiced by Carullo's failure to do so. While Stuckey avers that he would have testified that he "did not get drugs directly or indirectly from Span, and he did not pay drug money to Span," Ex. 2 to Am. Mot. ¶ 1(c), the wiretap recordings, Epps's and Allison's testimony, and Stuckey's prior statements suggest that this testimony would not have changed the outcome of the proceeding. Stuckey had made prior statements in a July 2003 proffer to the government implicating Span in a drug conspiracy with Epps and Allison and stating that Span had tried to intimidate him. While jurors could have believed that Stuckey's previous statements were false and that he was telling the truth at trial, given Epps's and Allison's testimony, an equally likely interpretation would be that Span succeeded in intimidating Stuckey. Stuckey also could have been impeached by his criminal record, which included four drug convictions. Although Stuckey was acquitted of the conspiracy charges he faced and only found guilty on a telephone count, the evidence presented at his trial indicated that he was a low-level operative whom the jury could have concluded was solely involved in the conspiracy as a buyer. Compared to the overwhelming evidence of Span's guilt, as brought out through Epps's and Allison's testimony and the recorded conversations, Stuckey's testimony, particularly when impeached by his prior proffer, would not have sufficiently changed the outcome of the proceeding to warrant a finding of prejudice.

### B. Lillie Bell

Span contends that his sister, Lillie Bell, could have been called to refute Green's testimony that Span offered to help him post bond if he killed Epps's mother and that Green had sent letters to Bell's house about his court hearings to try to get the bond money Span allegedly promised him. In her affidavit, Bell states that she never received a letter from Green. Bell Aff. ¶ 2. As with Stuckey, the failure to call Bell cannot be said to have prejudiced Span. Bell's

testimony could have easily been discredited as biased because she is Span's sister. *See Bergmann* v. *McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995); *United States* v. *Curtis*, 742 F.2d 1070, 1074-75 (7th Cir. 1984) (finding that a family member's bias in testifying would be readily apparent to a jury and outweigh its impeachment value). Moreover, her uncorroborated testimony would have only contradicted a small non-material portion of Green's overall testimony. This could have "caused more harm than quietly letting [Green's] testimony slip by," *United States* v. *Brown*, 739 F.2d 1136, 1146 (7th Cir. 1984); it would have had the effect of drawing attention to her motive in testifying as she did, while at the same time highlighting the most damaging, uncontradicted portions of Green's testimony, namely that Span offered to post Green's bond in order for Green to kill Epps's mother. Thus, counsel's failure to call Bell as a witness did not prejudice the outcome of the case.

## C. Nash, Savage, and Lee

Span also argues that other prison officials, particularly Nash, Savage, and Lee, could have been called to discredit the reasonableness of Epps's fear and to contradict the testimony of Princeton Davis, who testified that Span's threats were credible because of Span's extensive prison contacts. Span was required to present affidavits from each of these three potential witnesses indicating what they would have testified to in order to meet his "burden of supplying sufficiently precise information" of what would have been obtained by a diligent investigation. *United States* v. *Kamel*, 965 F.2d 484, 499 n.45 (7th Cir. 1992) (quoting *United States ex rel. Gross* v. *DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987). He failed to do so. Thus, the court cannot conclude that a different outcome would have resulted if Carullo had investigated and called these witnesses to testify at trial.

## IV. Negligent Acts and Omissions (Ground IV of the Amended Motion)

Span presents a litany of alleged errors on Carullo's part in failing to object to certain testimony and opening up areas of questioning that in hindsight Span argues was harmful.

> [A] defendant claiming ineffective assistance of counsel must prove that his attorney's acts or omissions somehow harmed his case. A complaint about the failure to object to the admission of evidence does not begin to make out a colorable claim of ineffective assistance if the complaint fails to allege that the evidence should ultimately have been excluded. There can be no prejudice if the evidence is admissible. Moreover, the failure to object to evidence that though prejudicial, is probably admissible, clearly qualifies as falling within the realm of tactics.

*United States* v. *Brown*, 739 F.2d 1136, 1146 (7th Cir. 1984). Span's challenges to Carullo's trial tactics do not have merit, as he has not shown that Carullo's representation at trial fell outside the bounds of reasonable professional assistance.

### A.       Statements by the Case Agent

Span alleges that his counsel was ineffective because he failed to object to the case agent's statements that the goal of the government's investigation into Span and others "was to improve the quality of life of the residents" around Rockwell Gardens and to "dismantle the hierarchy" of two street gangs. Trial Tr. 33:20–21, 34:22, Oct. 25, 2004. Considering that the agent's reference to gang and criminal activity was brief, it is doubtful that the jury would have been more likely to convict Span based on an emotional reaction to the agent's testimony rather than the overwhelming evidence presented during the lengthy direct testimony of both Allison and Epps as to the drug related nature of the conversations. Additionally, Span argues that counsel should have objected to the case agent's statement that certain taped conversations were criminal in nature as this was a legal conclusion related to the legality of the wiretap. The Seventh Circuit has held that evidence regarding steps taken to secure a wiretap has "the effect of improperly bolstering the credibility of the government's case in the eyes of the jury," *United States* v. *McMahan*, 495 F.3d 410, 417 (quoting *United States* v. *Cunningham*, 462 F.3d 708, 710 (7th Cir. 2006)), *vacated on other grounds by Smith* v. *United States*, 552 U.S. 1091, 128 S. Ct. 917, 169 L. Ed. 2d 719 (2008). Thus, an objection may have been proper. Nevertheless, Span cannot establish that failure to object to this portion of the case agent's testimony prejudiced him, even considered with the other alleged shortcomings in Carullo's representation.

The evidence of criminal activity was overwhelming and there was no further reference to this portion of the case agent's testimony regarding wiretap procedures.

Span also claims that counsel failed to timely object to the introduction of 404(b) evidence when the case agent stated that he followed Span to the Burlington Coat Factory after hearing call number 50. But Span ignores the fact that counsel objected, arguing that this evidence would "needlessly bolster the government's case" and was cumulative evidence not admissible under Federal Rule of Evidence 403. Trial Tr. 532:24–25, Oct. 28, 2004. The court overruled the objection, allowing the testimony because it was relevant in identifying Span and giving context for the call. Counsel continued to object that even a limiting instruction might not be enough to cure any prejudice resulting from the testimony, and the government was forced to truncate its original line of questioning. These objections, while not specifically identified as Rule 404(b) objections, are sufficient to undercut Span's argument that his counsel's actions in this situation were ineffective.

### B. Statements by Princeton Davis

Span claims that Carullo should have objected to Davis's testimony that Span would "take care of" Allison and Epps given the limited purpose of the admission of the Li'l Ride evidence. This testimony, however, went directly to the charge of witness intimidation and was not related to the Li'l Ride evidence. Similarly, Davis's testimony that Span told him he sold heroin at St. Stephens was admissible as an admission of a party opponent. Fed. R. Evid. 801(d)(2). Any objections to this evidence would have been meritless, as the evidence was admissible, and no prejudice can be shown as a result. *See Brown*, 739 F.2d at 1146.

While Span argues that Carullo opened the door to Davis's testimony about the Li'l Ride incident, Carullo objected to its admission. The fact that Carullo objected is fatal to Span's claim of ineffective assistance for failure to object, as counsel did exactly what Span claims he did not do. Further, Span would not be able to establish prejudice, as the court had determined that the evidence was admissible only as to credibility, and a limiting instruction was given to

this effect. *See United States* v. *Best*, 250 F.3d 1084, 1093 (7th Cir. 2001) (limiting instructions are presumed effective in reducing any prejudice from the introduction of Rule 404(b) evidence).


### C. Statements by Lester Green

Span similarly claims that Carullo's failure to object to Green's testimony that Span solicited Green to kill Epps's mother amounts to ineffective assistance. Carullo's failure to object, however, was not unreasonable. *Brown*, 739 F.2d at 1146 ("[T]he failure to object to evidence that though prejudicial, is probably admissible, clearly qualifies as falling within the realm of tactics."). Green's testimony not only corroborated Epps's testimony that he reasonably believed that Span was capable of carrying out the threats, but it also was directly relevant to the charge of witness tampering, which alleged that Span attempted to improperly influence Epps's testimony with these threats. Moreover, because the evidence was admissible, Span cannot show prejudice. *Brown*, 739 F.2d at 1146.

### D. Donnie Allison's Testimony

Finally, Span argues that Carullo was ineffective because he failed to ask Allison about whether he took Span's threat that anyone who spoke out against him would not survive in prison seriously and elicited from Allison that, on one occasion, Allison had given Kenny Cool heroin proceeds for Span. As discussed above, Span cannot now complain about the fact that Carullo did not ask this question of Allison while complaining that Carullo asked the same question of Epps. It is likely that Span would be arguing Carullo was ineffective for asking the question if he had done so, for it is likely to have led the government to ask Allison about the Li'l Ride evidence as well. Span cannot establish that the failure to ask this one question prejudiced him, particularly as he does not know how Allison would have answered. Further, how the revelation that Allison gave Kenny Cool money on one occasion for heroin prejudiced Span is not explained, nor does Span indicate why a question that led to this answer was outside the range of reasonable professional assistance.

## V. Government's Use of Wiretap Recordings and Carullo's Failure to Object to the Same (Grounds I and IV of Span's initial § 2255 petition)

Span contends that the government used inadmissible wiretap recordings in his trial and points to counsel's failure to object as a ground for ineffective assistance of counsel.[17] Such an objection, however, would have been frivolous and so counsel cannot be found to have been ineffective for not making it. The Fourth Amendment's specificity requirements are met when the original order identifies which phone is to be tapped. *United States* v. *Donovan*, 429 U.S. 413, 427 n.15, 97 S. Ct. 658, 50 L. Ed. 2d. 652 (1977). "It is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named." *Id.* Additionally, "there is no requirement to cut short an investigation that might well turn up more persuasive evidence and more bad actors." *United States* v. *Cellini*, No. 08 CR 888-4, 2009 WL 2601335, at *5 (N.D. Ill. Aug. 21 2009) (citing *Hoffa* v. *United States*, 385 U.S. 293, 309–310, 87 S. Ct. 408, 17 L. Ed. 374 (1966)). The government may use the same evidence derived from one wiretap in prosecutions for two different conspiracies so long as it is relevant to the latter conspiracy and approved by a judge. *See* 18 U.S.C. § 2517(5) ("[C]ommunications relating to offenses other than those specified in the order of authorization . . . . may be used . . . when authorized or approved by a judge."). There was no dispute about the propriety of the wiretap, and the court granted the government's motion in limine to preclude any challenges to its legality. Counsel cannot be found ineffective for abiding by this ruling.

## VI. Prosecutorial Misconduct (Grounds VI and VII of Span's initial § 2255 petition)

Span raises both a challenge to the government's closing arguments independently and under the guise of ineffective assistance for failure to object. He claims that the government misrepresented the facts and elements required to convict in closing argument, essentially

---

[17] The court will not consider this issue outside the scope of Span's ineffective assistance of counsel claim as it was raised for the first time in Span's § 2255 petition and good cause for and prejudice from failing to raise the issue on direct appeal has not been shown. *See Galbraith* v. *United States*, 313 F.3d 1001, 1006 (7th Cir. 2002).

challenging the government's statement that "[t]he defendant even in his opening statement said that there is overwhelming evidence that a conspiracy existed." Trial Tr. 612:24–613:1, Nov. 3, 2004. Neither challenge succeeds. As this is the first time Span raises the independent issue of prosecutorial misconduct and Span has not shown good cause for or prejudice from failing to raise the issue on direct review, *see Galbraith* v. *United States*, 313 F.3d 1001, 1006 (7th Cir. 2002), he has procedurally defaulted this claim. Even if Span had properly raised this claim, it would fail. In reviewing charges of prosecutorial misconduct, the court first looks to whether the challenged remarks were improper and then to whether they prejudiced the defendant. *United States* v. *Serfling*, 504 F.3d 672, 677 (7th Cir. 2007). Span alleges that the government misrepresented the elements needed to convict him in its closing argument and falsely claimed that Span had conceded that the evidence showed that a conspiracy existed. The government's statement regarding Span's concession only repeated what Span's counsel had stated in his opening statement. The government cannot be faulted for using a statement made by Span's counsel to its advantage. Further, the government did not misrepresent the elements of conspiracy. As the government's statements were not improper, a claim of prosecutorial misconduct based on these statements would fail. *See United States* v. *Whitaker*, 127 F.3d 595, 606 (7th Cir. 1997) ("If we find the comments are proper, the analysis ends."). Similarly, any claim of ineffective assistance for failure to challenge these statements does not have merit, as Span cannot show prejudice. *See Brown*, 739 F.2d at 1146.

## VII. Preparation of *Pro Se* Petition (Ground VIII of Span's initial § 2255 petition)

Span argues that he was prejudiced by Carullo's failure to turn over to him discovery material and trial transcripts posttrial, which forced him to file his habeas petition "almost in the blind raising issues for review." Civ. R. 3 at 16. This ground is now moot, however, as any such prejudice has been cured by the appointment of counsel in this proceeding, who was given access to all case materials.

## VIII. Evidentiary Hearing

"In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro* v. *Landrigan*, 550 U.S. 465, 474, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007). A court need not hold an evidentiary hearing, however, "if the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Id.* Span's various filings, the government's response, and the record in the case have conclusively demonstrated that Span is not entitled to any relief under § 2255, even if his factual allegations were proven because he cannot show how the alleged failings of counsel prejudiced him. As such, Span's request for an evidentiary hearing will be denied.

## IX. Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, the court must issue or deny a certificate of appealability when it enters a final order adverse to the petitioner. With respect to claims of constitutional violations denied on their merits, a habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El* v. *Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make a substantial showing the petitioner must show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack* v. *McDaniel*, 529 U.S. at 484 (quoting *Barefoot* v. *Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983). The COA requirement is a threshold issue and a determination of whether one should issue neither requires nor permits full consideration of the factual and legal merits of the claims. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 335–36. Span has provided only conclusional assertions that he suffered prejudice as a result of any of Carullo's alleged failures in providing competent representation, either

individually or cumulatively. The evidence against Span was overwhelming. Thus, the court can find no reason why reasonable jurists would debate or disagree with this court's ruling and denies Span a certificate of appealability.

## CONCLUSION AND ORDER

For the reasons stated above, Span's amended § 2255 petition to vacate, set aside, or correct his sentence [#22] is denied. His motions for production of documents [#38] and for an evidentiary hearing [#40] are also denied. A certificate of appealability is denied. The case is terminated.

ENTER:

Dated: August 3, 2010

_____
JOAN HUMPREY LEFKOW
United States District Judge